## IN THE UNITED STATES DISTRICT
## FOR THE DISTRICT OF COLORADO

Civil Action No.:

JENNIFER RABEN, ON BEHALF OF HERSELF AND ALL OTHERS SIMILARLY
SITUATED,

      Plaintiff,

v.

QUEST DIAGNOSTICS, INC.,

      Defendant.

---

## CLASS ACTION COMPLAINT

---

For her Class Action Complaint, Plaintiff Jennifer Raben ("Plaintiff"), on behalf of herself and all others similarly situated, alleges the following against Quest Diagnostics, Inc. ("Quest" or "Defendant"), based on personal knowledge as to Plaintiff and Plaintiff's own acts and on information and belief as to all other matters based upon, *inter alia*, the investigation conducted by and through Plaintiff's undersigned counsel:

### SUMMARY OF THE CASE

1.     This case involves a data breach of the second largest medical billing collections agency in the United States, American Medical Collections Agency, Inc. ("AMCA"), in which the personally identifiable information ("PII") of over 20 million patients of one of AMCA's clients, Quest, was exposed to and stolen by unauthorized users. The PII exposed and stolen consists of, *inter alia*, Social Security numbers, bank account information, credit card information, protected health information as defined by the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), and other personal, sensitive, and private information.

2.     Quest is a world leader in diagnostic information services, clinical trials, and drug screening, generating over $7.5 billion in revenue in 2018. It is a constituent of Standard & Poor's 500 Index, has over 46,000 employees, and is on Forbes 500 list.

3.     When one of its patients' bills becomes delinquent, Quest utilizes AMCA as a collection agency for that bill. As part of its relationship with AMCA and in order to expedite the collection of delinquent bills, Quest provides AMCA with those patients' PII.

4.     On June 3, 2019, Quest publicly announced a data breach impacting the patients whose PII it provided to AMCA in a Form 8-K filed with the Securities and Exchange Commission (the "Data Breach"):

> On May 14, 2019, American Medical Collection Agency (AMCA), a billing collections vendor, notified Quest Diagnostics Incorporated ("Quest Diagnostics") and Optum360, LLC, Quest Diagnostic's revenue cycle management provider, of potential unauthorized activity on AMCA's web payment page. . . . AMCA has informed Quest Diagnostics and Optum360 that:
>
> - between August 1, 2018 and March 30, 2019 an unauthorized user had access to AMCA's system that contained information that AMCA had received from various entities, including Quest Diagnostics, and information that AMCA collected itself;
> - the information on AMCA's affected system included financial information (*e.g.*, credit card numbers and bank account information), medical information and other personal information (*e.g.*, Social Security Numbers); [and]
> - as of May 31, 2019, AMCA believes that the number of Quest Diagnostics patients whose information was contained on AMCA's affected system was approximately 11.9 million people . . . .

5.     Even though AMCA manages over $1 billion in annual receivables for its clients, including Quest, it failed to maintain adequate safeguards to protect the patient PII of its clients and to properly monitor its safeguards, resulting in the Data Breach and allowing hackers access to Quest patients' PII for eight months.

6.     Quest failed to properly monitor AMCA, its business associate and agent, to ensure that adequate safeguards were in place to protect its patients' PII and that those safeguards were properly monitored.

7.      Quest was obligated by HIPAA, industry standards, common law, and its own representations to Plaintiff and the other Class members to keep their PII confidential and to protect their PII from unauthorized access, disclosure, and use.

8.      As a result of Quest's failures, Plaintiff and the other Class members were damaged.

9.      This Class Action Complaint is filed on behalf of all persons in the United States, described more fully *infra*, whose PII was compromised in the Data Breach.

## JURISDICTION AND VENUE

10.      This Court has jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because the aggregate amount in controversy exceeds $5,000,000, exclusive of interests and costs, there are more than 100 Class members, and at least one Class member is a citizen of a state different from Defendant. The Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

11.      Venue is proper under 28 U.S.C. § 1391(c) because Defendant is a corporation that does business in and is subject to personal jurisdiction in this District. Venue is also proper because a substantial part of the events or omissions giving rise to the claims in this action occurred in or emanated from this District.

## PARTIES

**A.      Plaintiff**

12.      Plaintiff Jennifer Raben is a resident and citizen of the State of Colorado.

13.      Ms. Raben was a patient of Quest and provided Quest with PII, including her name, birthdate, gender, email address, mailing address, cellular telephone number, credit card numbers with expiration dates and corresponding billing addresses, Social Security number, bank information, and health information, among other things.

14.      Quest provided AMCA with Ms. Raben's PII in connection with a debt collection by Quest. On or about June 4, 2019, she received notification that her PII may have been compromised in the Data Breach, including her first and last name, her Social Security number, the name of the Quest lab or medical service provider, the date of medical service, the referring

doctor and certain other medical information. The notification letter from AMCA is attached as "Exhibit A."

15.     As a result of the Data Breach, Ms. Raben suffered exposure of what had previously been tightly maintained and secure PII described above and has had to expend valuable time preventing and/or resolving identity theft and/or fraud.

**B.     Defendant**

16.     Quest is a Delaware corporation with its principal headquarters in the State of New Jersey.

17.     Quest is a "covered entity" as defined under 45 C.F.R. § 160.13.

18.     At all relevant times, Quest and AMCA were subject to a business associate agreement ("BAA") to which they are both parties.

19.     At all relevant times, Quest was and is engaged in business in El Paso County, Colorado, and throughout the United States of America.

## FACTUAL BACKGROUND

**A.     Quest Acquired and Stored Patient PII, and Transmitted the PII of Its Delinquent Patients to AMCA to Obtain Payment**

20.     Quest requires that patients entrust their PII to Quest as a condition of providing healthcare services.

21.     Quest acquires and stores patient PII, including protected health information.

22.     By acquiring and storing PII from Plaintiff and the other Class members, Quest assumed legal and equitable duties to those patients and knew or should have known that it was responsible for maintaining adequate safeguards to protect that PII from unauthorized access and use.

23.     Plaintiff and the other Class members took reasonable steps to maintain the confidentiality of their PII. As current and former patients of Quest, they relied on Quest to keep their PII safe from unauthorized access and use.

24.     Through their contractual relationship under the BAA, and their agency relationship under the Federal common law of agency, Quest transmitted to AMCA patient PII it collected, stored, received, and created for AMCA's use in collecting bills from those patients on behalf of, and for the benefit of, Quest.

25.     Quest has acknowledged its obligation to maintain the privacy of patient PII entrusted to it and prevent such PII from being disclosed without authorization.[1]

**B.      Quest Made Specific Representations to Patients Regarding Its Protection of Their PII**

26.     Plaintiff and the other Class members provided their PII to Quest with the reasonable expectation and mutual understanding that Quest and any business associates and agents to which Quest disclosed the PII would comply with their obligations to keep such PII confidential and secure from unauthorized access.

27.     Quest promised to keep patient PII confidential, stating in its Notice of Privacy Practices that it is "committed to protecting the privacy of your identifiable health information" and that it "is required by law to maintain the privacy of your [PII]."[2]

28.     In its Online Privacy Policy, Quest represented to users of its website that it "believe[s] that privacy is important to the success and use of the Internet," and in the "How We Protect Information Online" section of its Online Privacy Policy, Quest represented that it would "exercise great care to protect your personal information," that "[o]nly those employees and

---

[1] Quest, *Quest Diagnostic Statement on the AMCA Data Security Incident*, *available at* http://newsroom.questdiagnostics.com/AMCADataSecurityIncident (last visited June 28, 2019) ("Quest is taking this matter very seriously and is committed to the privacy and security of our patients' personal information.").

[2] Quest, *Notice of Privacy Practices* (effective April 12, 2018), *available at* https://www.questdiagnostics.com/home/privacy-policy/notice-privacy-practices.html (last visited June 28, 2019).

contractors with a business reason to know have access to [PII]," and that it would "review our security arrangements from time to time as we deem appropriate."[3]

29.     Patients value their data privacy and security and consider it when engaging in medical and healthcare services. Plaintiff and the other Class members would not have utilized Quest's services had they known that Quest did not adequately ensure that its business associates and agents, like AMCA, maintain adequate safeguards to protect the PII Quest provided them and properly monitor those safeguards.

30.     Despite these representations, Quest's lax approach to data security resulted in the Data Breach affecting over 20 million patients during an eight-month span.

### C.     Quest's Inadequate Oversight of Data Security Allowed for the Data Breach to Occur

31.     Quest is required to maintain the privacy of patient PII and prevent its unauthorized use. Quest is not only required to do so when it acquires, creates, stores, and maintains patient PII itself, but also when it provides patient PII to third-parties like AMCA to receive, store, maintain, and utilize on its behalf and for its benefit. Here, Quest provided the PII of Plaintiff and the other Class members to AMCA in order for AMCA to perform bill collection services for the benefit of Quest. Yet Quest failed to ensure that there were adequate safeguards in place at AMCA to prevent third-parties from accessing the PII of Plaintiff and the other Class members without their consent. Quest has represented that this vulnerability could have potentially affected over 20 million Quest patients over the course of eight months.

32.     In sum, the Data Breach made it possible for third-parties to access the PII of patients who never had an opportunity to consent to such access.

---

[3] Quest, *Online Privacy Policy* (December 5, 2018), *available at* https://www.questdiagnostics.com/home/privacy-policy/online-privacy.html (last visited June 28, 2019).

**D.      Quest Was Aware that the Medical Industry Was a Prime Target for Hackers**

33.      Before the instant Data Breach occurred, numerous other data breaches had occurred affecting healthcare companies like Anthem[4], Premera[5], and St. Joseph Health System[6], among others.

34.      As early as 2014, the FBI alerted healthcare stakeholders that they were prime targets for hackers, stating that "'[t]he FBI has observed malicious actors targeting healthcare related systems, perhaps for the purpose of obtaining Protected Healthcare Information (PHI) and/or Personally Identifiable Information (PII).'"[7]

35.      Quest did not heed this warning, failing to ensure the existence of adequate safeguards to protect patients' PII that resulted in the Data Breach.

**E.      Quest's Failures and HIPAA Violations**

36.      Quest's failure to ensure the existence of adequate security measures at AMCA demonstrate that it failed to honor its duties and representations to Plaintiff and the other Class members by not:

a.      Maintaining adequate security safeguards to reduce the risk of data breaches and cyberattacks;

b.      Adequately protecting patients' PII;

---

[4] LOS ANGELES TIMES, *Anthem is warning consumers about its huge data breach. Here's a translation*, March 6, 2015, *available at* https://www.latimes.com/business/la-fi-mh-anthem-is-warning-consumers-20150306-column.html (last visited June 28, 2019).

[5] NEW YORK TIMES, *Premera Blue Cross Says Data Breach Exposed Medical Data*, March 17, 2015, *available at* https://www.nytimes.com/2015/03/18/business/premera-blue-cross-says-data-breach-exposed-medical-data.html (last visited June 28, 2019) .

[6] NAPA VALLEY REGISTER, *St. Joseph Health System sued for patient data breach*, April 9, 2012, *available at* http://napavalleyregister.com/news/local/st-joseph-health-system-sued-for-patient-databreach/article_948c0896-82a3-11e1-bed6-0019bb2963f4.html (last visited June 28, 2019).

[7] REUTERS, *FBI warns healthcare firms they are targeted by hackers*, August 20, 2014, *available at* http://www.reuters.com/article/us-cybersecurity-healthcare-fbi-idUSKBN0GK24U20140820 (last visited June 28, 2019).

c.      Properly monitoring data security systems for existing intrusions;

d.      Ensuring that its business associates and agents employed adequate safeguards to protect patient PII and prevent its unauthorized access;

e.      Ensuring the confidentiality and integrity of patient PII it created, received, maintained, and/or transmitted in violation of 45 C.F.R. § 164.306(a)(1);

f.      Implementing technical policies and procedures for electronic systems that maintain PII to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1);

g.      Implementing policies and procedures to detect, contain, and correct security violations in violation of 45 C.F.R. § 164.308(a)(1)(i);

h.      Implementing procedures to review records of information system activity regularly, such as audit logs, access reports, and security incident tracking reports in violation of 45 C.F.R. § 164.308(a)(1)(ii)(D);

i.      Protecting against reasonably anticipated threats or hazards to the security or integrity of PII in violation of 45 C.F.R. § 164.306(a)(2);

j.      Protecting against reasonably anticipated uses or disclosures of electronic PII that are not permitted under the privacy rules regarding identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

k.      Ensuring compliance with HIPAA security standard rules by its workforce in violation of 45 C.F.R. § 164.306(a)(4); and/or

l.      Training all members of its workforces effectively on the policies and procedures regarding PII as necessary and appropriate for the members of its workforce to carry out its functions and to maintain security of PII in violation of 45 C.F.R. § 164.530(b).

37.      Furthermore, Quest is liable in accordance with the Federal common law of agency for any and all of AMCA's HIPAA violations where AMCA is Quest's business associate and agent pursuant to 45 C.F.R. § 160.402(c)(1).[8] Quest provided AMCA with patient PII, and AMCA used that PII in furtherance of carrying out its obligations to Quest under its BAA to collect delinquent bills on behalf of, and for the benefit of, Quest.

---

[8] "A covered entity is liable, in accordance with the Federal common law of agency, for a civil money penalty for a violation based on the act or omission of any agent of the covered entity, including a workforce member or business associate, acting within the scope of the agency."

### F.      Patients' PII Is an Increasingly Valuable Commodity

38.      PII exposed and stolen in the Data Breach such as bank information, credit card information, medical information, Social Security numbers, dates of birth, etc. is incredibly valuable to identity thieves. The PII exposed and stolen in the Data Breach can all be used to gain access to, *inter alia*, a variety of financial accounts, websites, and online accounts.

39.      Healthcare related PII is among the most sensitive and damaging when compromised. One report found that the "average total cost to resolve an identity-theft related incident . . . came to about $20,000," and that the victims were forced to pay out-of-pocket costs for health care they did not receive in order "to restore coverage."[9] Almost 50% of victims lost their health insurance coverage as a result of an identity-theft incident, while nearly one third said their insurance premiums increased. And 40% of patients were never able to resolve the identity-theft *at all*. In sum, data breaches, like the instant Data Breach here, can have and have had a crippling effect on patients individually and the economy as a whole.[10]

40.      Identity thieves can also use the PII to harm Plaintiff and the other Class members through embarrassment, blackmail, or harassment in person or online or to commit other types of fraud including fraudulently obtaining ID cards or driver's licenses, tax returns and refunds, and government benefits. A Presidential identity theft report from 2007 states that:

> In addition to the losses that result when identity thieves fraudulently open accounts or misuse existing accounts, . . . individual victims often suffer indirect financial costs, including the costs incurred in both civil litigation initiated by creditors and in overcoming the many obstacles they face in obtaining or retaining credit. Victims of non-financial identity theft, for example, health-related or criminal record fraud, face other types of harm and frustration.

---

[9] Elinor Mills, *Study: Medical identity theft is costly for victims*, CNET (March 3, 2010) https://www.cnet.com/news/study-medical-identity-theft-is-costly-for-victims/ (last visited June 28, 2019).

[10] Identity Theft Resource Center, *2018 End-of-Year Data Breach Report*, *available at* https://www.idtheftcenter.org/2018-data-breaches/ (last visited June 28, 2019).

In addition to out-of-pocket expenses that can reach thousands of dollars for the victims of new account identity theft, and the emotional toll identity theft can take, some victims have to spend what can be a considerable amount of time to repair the damage caused by the identity thieves. Victims of new account identity theft, for example, must correct fraudulent information in their credit reports and monitor their reports for future inaccuracies, close existing bank accounts and open new ones, and dispute charges with individual creditors.[11]

41.     To put it into context, the 2013 Norton Report[12] – based on one of the largest consumer cybercrime studies ever conducted – estimated that the global price tag of cybercrime was around *$113 billion* at that time, with the average cost per victim being $298 dollars, as demonstrated in the chart below:



42.     The problems associated with identity theft are exacerbated by the fact that many identity thieves will wait years before attempting to use the PII they have obtained. Indeed, in

---

[11] U.S. FTC, *The President's Identity Theft Task Force, Combating Identity Theft: A Strategic Plan*, (April 2007), *available at* https://www.ftc.gov/sites/default/files/documents/reports/combating-identity-theft-strategic-plan/strategicplan.pdf (last visited June 28, 2019).

[12] Norton by Symantec, *2013 Norton Report*, *available at* https://yle.fi/tvuutiset/uutiset/upics/liitetiedostot/norton_raportti.pdf (last visited June 28, 2019).

order to protect themselves, Plaintiff and the other Class members will need to remain vigilant against unauthorized data use for years and decades to come.

43.     Once stolen, personal information can be used in a number of different ways. One of the most common ways is that it is offered for sale on the dark web, a heavily encrypted part of the Internet that makes it difficult for authorities to detect the location or owners of a website. Due to its hidden nature and the use of special applications to maintain anonymity, the dark web is a haven for all kinds of illicit activity, including the trafficking of stolen personal information captured via data breaches or hacks.[13] One 2018 study found that an individual's online identity is worth approximately $1,170 on the dark web.[14]

44.     Once someone buys personal information, it is then used to gain access to different areas of the victim's digital life—and increase the risk of further identity theft—including bank accounts, social media, and credit card details. During that process, other sensitive data may be harvested from the victim's accounts, as well as from those belonging to family, friends, and colleagues.

45.     Personal information can also be used by scammers to target victims using phishing scams.[15] Phishing is when scammers use personal information they have obtained about victims to send fraudulent emails or texts, or copycat websites to get victims to share additional valuable

---

[13] Experian, *What is the Dark Web?* (March 7, 2019), *available at* https://www.experian.com/blogs/ask-experian/what-is-the-dark-web/ (last visited June 28, 2019). *See also* Brian Hamrick, *The dark web: A trip into the underbelly of the internet*, WLWT News (Feb. 9, 2017), *available at* http://www.wlwt.com/article/the-dark-web-a-trip-into-the-underbelly-of-the-internet/8698419 (last visited June 28, 2019).

[14] TOP10VPN, Dark Web Market Price Index (US Edition) (February 27, 2018), *available at* https://www.top10vpn.com/privacy-central/privacy/dark-web-market-price-index-feb-2018-us/ (last visited June 28, 2019).

[15] U.S. FTC, *How to Recognize and Avoid Phishing Scams* (July 2017), *available at* https://www.consumer.ftc.gov/articles/how-recognize-and-avoid-phishing-scams (last visited June 28, 2019).

personal information – such as account numbers, Social Security numbers, or login IDs and passwords.[16] Scammers use victims' information, including PII, to steal the victims' money, identity, or both.[17] Scammers also use phishing emails to get access to a victim's computer or network, then install programs like ransomware that can lock a victim out of important files on their computer.[18] According to one Federal Bureau of Investigation study, scammers collected more than $676 million in 2017 alone through two types of phishing scams: "Business Email Compromise" and "Email Account Compromise."[19]

### G.   Damages

46.    Financial information, Social Security numbers, and medical information exposed and stolen in the Data Breach are particularly useful for hackers to defraud Plaintiff and the other Class members by, *e.g.*, opening loans in their names, obtaining driver's licenses or other official identification cards in their names, obtaining government benefits using PII, giving personal information to police during an arrest, resulting in an arrest warrant being issued in the victim's name, billing for medical services in their names, committing tax return fraud, opening utility bills in their names, committing credit card fraud, and committing similar identity theft.[20]

47.    Plaintiff and the other Class members may thus be required to spend valuable time preventing and/or resolving identity theft or fraud in addition to incurring out-of-pocket costs for protective measures such as credit monitoring services, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

---

[16] *Id.*

[17] *Id.*

[18] *Id.*

[19] U.S. Federal Bureau of Investigation, *2017 Internet Crime Report*, *available at* https://pdf.ic3.gov/2017_IC3Report.pdf (last visited June 28, 2019).

[20] *See* Federal Trade Commission, *Warning Signs of Identity Theft*, *available at* https://www.identitytheft.gov/Warning-Signs-of-Identity-Theft (last visited June 28, 2019).

48. Plaintiff and the other Class members were also damaged where they paid Quest for its services and did not receive any benefit of the bargain. Plaintiff and the other Class members overpaid for a service that Quest represented would be accompanied by adequate data security but was not. Part of the amount paid by Plaintiff and the other Class members for Quest's services was intended to be used by Quest to fund adequate data security and monitor its business associates' and agents' compliance with data security obligations. Quest did not properly monitor compliance and thus Plaintiff and the other Class members did not get what they paid for.

49. Due to Quest's conduct alleged herein, Plaintiff and the other Class members have a greater risk of identity theft, manipulation, fraud, scams, and/or targeted unwanted and unnecessary advertising, including inappropriate communications. Additionally, they now face security risks such as phishing attempts, efforts by hackers to access or login to their online accounts, friend requests from trolls or cloned or imposter accounts, and/or other interference with their online accounts. They are subjected to a heightened risk of such predatory conduct due to Quest's failure to secure their PII, including the sale of their content and PII on the dark web and other illicit databases.

## **CLASS ACTION ALLEGATIONS**

50. Pursuant to Federal Rules of Civil Procedure 23(b)(2), (b)(3), and (c)(4), Plaintiff, individually and on behalf of all others similarly situated, brings this lawsuit on behalf of herself and as a class action on behalf of the following Nationwide Class:

> Nationwide Class: All persons in the United States who utilized Quest's services and whose PII Quest shared with AMCA and was contained on AMCA's database between August 1, 2018, and March 30, 2019 ("Class").

51. Excluded from the Class are Defendant and any entities in which Defendant or its subsidiaries or affiliates have a controlling interest, as well as Defendant's officers, agents, and employees. Also excluded from the Class are the judge assigned to this action, members of the judge's staff, and any member of the judge's immediate family. Plaintiff reserves the right to

amend the Class definitions if discovery and further investigation reveal that any definitions should be expanded or otherwise modified.

52. **Numerosity**: The members of the Class are so numerous that joinder of all members of the Class would be impracticable. Defendant has indicated that over 20 million patients' PII was compromised as a result of the Data Breach. The identities of these patients can be determined through records and documents maintained by Defendant.

53. **Commonality and Predominance**: This action involves common questions of law or fact, which predominate over any questions affecting individual Class members, including:

  a.  Whether Quest represented to Plaintiff and the Class that it would safeguard their PII;

  b.  Whether Quest owed a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their PII;

  c.  Whether Quest breached a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their PII;

  d.  Whether third-parties improperly obtained Plaintiff and the other members of the Class' PII without authorization or in excess of any authorization;

  e.  Whether Quest was aware of third-parties' collection of Plaintiff and the other Class members' PII without authorization or in excess of any authorization;

  f.  Whether Quest's conduct violated HIPAA;

  g.  Whether Quest's conduct was an unlawful or unfair business practice under N.J. Stat. Ann. § 56:8-1, *et seq.*;

  h.  Whether Quest's conduct violated § 5 of the FTC Act, 15 U.S.C. § 45, *et seq.*;

  i.  Whether Quest and AMCA share an agency relationship;

  j.  Whether Quest can be held liable for AMCA's failures described herein through an agency theory;

  k.  Whether Plaintiff and the Class are entitled to equitable relief, including, but not limited to, injunctive relief and restitution; and

l.      Whether Plaintiff and the other members of the Class are entitled to actual, statutory, or other forms of damages, including nominal damages, and other monetary relief.

54.     Quest engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff individually and on behalf of Class members. Similar or identical statutory and common law violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quantity and quality, to the numerous common questions that dominate this action.

55.     Moreover, Quest provides in its Terms and Conditions that the laws of the State of New Jersey apply to all matters relating to the use of Quest's website, further evidencing that common questions of law apply to the claims of Plaintiff and the other Class members.[21]

56.     **Typicality**: Plaintiff's claims are typical of the claims of the other members of the Class because, among other things, Plaintiff and the other Class members were injured through substantially uniform misconduct by Quest. Plaintiff is advancing the same claims and legal theories on behalf of herself and all other Class members, and there are no defenses unique to Plaintiff. The claims of Plaintiff and the other Class members arise from the same operative facts and are based on the same legal theories.

57.     **Adequacy of Representation**: Plaintiff is an adequate representative of the Class because her interests do not conflict with the interests of the other Class members she seeks to represent, she has retained counsel competent and experienced in complex class action litigation, and she will prosecute this action vigorously. The Class members' interests will be fairly and adequately protected by Plaintiff and her counsel.

58.     **Superiority**: A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this matter as a class action. The damages, harm, or other financial detriment

---

[21] Quest, *Privacy Policy Terms and Conditions, available at* https://www.questdiagnostics.com/home/privacy-policy/terms-conditions.html (last visited June 28, 2019).

suffered individually by Plaintiff and the other members of the Class are relatively small compared to the burden and expense required to litigate their claims on an individual basis against Quest, making it impracticable for Class members to individually seek redress for Quest's wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation could result in inconsistent or contradictory judgments, and increase the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

59.   Further, Quest has acted or refused to act on grounds generally applicable to the Class and, accordingly, final injunctive or corresponding declaratory relief with regard to the members of the Class as a whole is appropriate under Rule 23(b)(2).

60.   Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a.   Whether Class members' PII was improperly obtained by third-parties;

b.   Whether Quest's conduct was an unlawful or unfair business practice under N.J. Stat. Ann. § 56:8-1, *et seq*.;

c.   Whether Quest's representations that it would secure and protect the PII of Plaintiff and the other members of the Class were facts that reasonable persons could be expected to rely upon when deciding whether to use Defendant's services;

d.   Whether Quest misrepresented the safety of its many systems and services, specifically the security thereof, and its ability to safely store Plaintiff's and the other Class members' PII;

e.   Whether Quest failed to adequately monitor its agents and business associates and the adequacy of their security measures, including AMCA;

f.   Whether Quest concealed crucial information about it and AMCA's inadequate data security measures from Plaintiff and the Class;

g.   Whether Quest failed to comply with its own policies and applicable laws, regulations, and industry standards relating to data security;

h.      Whether Quest knew or should have known that it and AMCA did not employ reasonable measures to keep Plaintiff's and the other Class members' PII secure and prevent the unauthorized disclosure of that information;

i.      Whether Quest failed to "implement and maintain reasonable security procedures and practices" for Plaintiff's and the other Class members' PII in violation of § 5 of the FTC Act, 15 U.S.C. § 45, *et seq.*;

j.      Whether Quest owed a duty to Plaintiff and the Class to safeguard their PII and to implement adequate data security measures;

k.      Whether Quest breached that duty;

l.      Whether Quest failed to adhere to its posted privacy policy concerning the care they would take to safeguard Plaintiff's and the other Class members' PII;

m.      Whether Quest negligently and materially failed to adhere to its posted privacy policy with respect to the extent of its disclosure of patients' data;

n.      Whether such representations were false with regard to storing and safeguarding Class members' PII; and

o.      Whether such representations were material with regard to storing and safeguarding Class members' PII.

## First Claim for Relief
### Negligence

61.      Plaintiff hereby repeats, realleges, and incorporates by reference each and every allegation contained in Paragraphs 1 through 60 as though the same were fully set forth herein.

62.      Quest required Plaintiff and the other Class members to submit PII in order to obtain medical services, which it then forwarded to AMCA for billing/collections purposes on its behalf and for its benefit.

63.      By collecting and storing this PII, and sharing and using it for commercial gain, Defendant had a duty of care to use reasonable means to secure and safeguard Plaintiff's and the other Class members' PII, prevent unauthorized disclosure of and access to their PII, and to safeguard their PII from theft. Defendant's duty included a responsibility to implement processes by which they could detect a breach of their security systems in a reasonable timeframe.

64. Defendant also owed Plaintiff and the other Class members duties of care as established by HIPAA, 45 C.F.R. §§ 160, 162, 164 to:

      a.     ensure the confidentiality, integrity, and availability of Plaintiff's and the other Class members' PII Quest received, maintained, and/or transmitted, some of which included "protected health information" within the meaning and scope of HIPAA;

      b.     implement policies and procedures to prevent unauthorized access to Plaintiff's and the other Class members' PII;

      c.     protect against any reasonably anticipated threats or hazards to the security or integrity of that PII;

      d.     ensure compliance with its duties by its workforce; and

      e.     otherwise ensure that Plaintiff's and the other Class members' PII was safeguarded.

65. Defendant also owed Plaintiff and the other Class members a duty of care to provide data security measures consistent with industry standards and to ensure that its systems, and the personnel responsible for them, adequately protected Plaintiff's and the other Class members' PII.

66. Defendant's duty of care to use adequate security measures arose as a result of the special relationship that existed between Quest and its business associates and agents on the one hand, and Plaintiff and the other Class members on the other, which is recognized by laws and regulations, including, but not limited to, HIPAA and common law. Defendant was in a position to ensure that its systems were sufficient to protect against the foreseeable risk of harm to Plaintiff and the other Class members that arose from the Data Breach.

67. Defendant breached its duties by failing to implement adequate safeguards to protect Plaintiff's and the other Class members' PII. Defendant's specific negligent acts and omissions include, but are not limited to, the following:

      a.     Failing to adopt, implement, and maintain adequate safeguards to protect Plaintiff's and the other Class members' PII;

      b.     Failing to adequately monitor AMCA's security measures;

      c.      Failure by Quest to periodically ensure its business associates and agents, including AMCA, had plans in place to maintain adequate safeguards to protect Plaintiff's and the other Class members' PII;

      d.      Allowing unauthorized access to Plaintiff's and the other Class members' PII; and

      e.      Failing to timely detect the Data Breach.

68.    It was foreseeable that Defendant's negligent acts and omissions would result in the Data Breach and injury to Plaintiff and the other Class members. Plaintiff and the other Class members were foreseeable victims of Defendant's inadequate security measures and security monitoring procedures. Defendant knew or should have known of the inherent risks in collecting and storing PII, the critical importance of providing adequate safeguards to protect PII, the appealing nature of the healthcare industry to hackers, and its inadequate security monitoring protocols in place to protect the PII of Plaintiff and the other Class members.

69.    Plaintiff and the other Class members had no ability to protect their PII that was entrusted to Defendant.

70.    Defendant was in a position to protect against the harm suffered by Plaintiff and the other Class members as a result of the Data Breach.

71.    Defendant had a duty to maintain adequate safeguards to protect Plaintiff's and the other Class members' PII from unauthorized access and use.

72.    Defendant admitted that Plaintiff's and the other Class members' PII was accessed without authorization by third-persons as a result of the Data Breach.

73.    Defendant breached its duty to Plaintiff and the other Class members by failing to exercise reasonable care in protecting and safeguarding their PII while it was in Defendant's control or possession.

74.    Defendant improperly and inadequately safeguarded the PII of Plaintiff and the other Class members in derogation of industry standard rules, regulations, and practices at the time of the Data Breach.

75.     Defendant unlawfully breached its duty to Plaintiff and the other Class members by failing to have appropriate procedures in place to detect and prevent unauthorized access of their PII.

76.     But for Defendant's breaches of its duties to Plaintiff and the other Class members, their PII would not have been compromised and they would not have been damaged.

77.     As a result of Defendant's negligence, Plaintiff and the other Class members have suffered damages in an amount to be proven at trial

78.     Plaintiff and the other Class members are also entitled to injunctive relief requiring Defendant to, *inter alia*, strengthen its safeguards to protect PII, strengthen its monitoring procedures of those safeguards, submit to future annual audits of those safeguards and monitoring procedures, and immediately provide free credit monitoring services to Plaintiff and the other Class members.

## Second Claim for Relief
### Vicarious Liability

79.     Plaintiff hereby repeats, realleges, and incorporates by reference each and every allegation contained in Paragraphs 1 through 78 as though the same were fully set forth herein.

**A.     Agency Relationship**

80.     Quest is a "covered entity" as defined by 45 C.F.R. § 160.13.

81.     AMCA is a "business associate" of Quest as defined by 45 C.F.R. § 160.13.

82.     Quest provided Plaintiff's and the other Class members' PII to AMCA.

83.     AMCA used that PII in order to collect monies from Plaintiff and the other Class members that was due and owed to Quest.

84.     AMCA's efforts to collect those monies benefitted Quest where AMCA would remit a portion of the monies collected to Quest.

85.     Quest directed and/or controlled AMCA's collection of monies by electing which PII to provide and not provide to assist in AMCA's collection efforts.

86.     Quest also set forth policies and procedures that AMCA was required to abide by when attempting to collect monies from Plaintiff and the other Class members. These policies and procedures were set forth in, *inter alia*, the BAA between Quest and AMCA.

87.     Quest and AMCA shared an agency relationship under Federal common law of agency.

**B.      AMCA's Negligence**

88.     By collecting Plaintiff's and the other Class members' PII from Quest, and storing and using it for commercial gain on Quest's behalf and for its benefit, AMCA had a duty of care to use reasonable means to secure and safeguard their PII, prevent unauthorized disclosure of and access to their PII, and to protect their PII from theft. AMCA's duty included a responsibility to implement processes by which it could detect a breach of its security systems in a reasonable timeframe.

89.     Even though Plaintiff and the other Class members provided their PII to Quest, AMCA as Quest's business associate also owed Plaintiff and the other Class members duties of care as established by HIPAA, 45 C.F.R. §§ 160, 162, 164 to:

      a.      Ensure the confidentiality, integrity, and availability of Plaintiff's and the other Class members' PII that Quest received, maintained, and/or transmitted, some of which included "protected health information" within the meaning and scope of HIPAA;

      b.      implement policies and procedures to prevent unauthorized access to Plaintiff's and the other Class members' PII;

      c.      protect against any reasonably anticipated threats or hazards to the security or integrity of that PII;

      d.      ensure compliance with its duties by its workforce; and

      e.      otherwise ensure that Plaintiff's and the other Class members' PII was safeguarded.

90.     AMCA, as Quest's business associate, also owed Plaintiff and the other Class members a duty of care to provide data security measures consistent with industry standards and

to ensure that its systems, and the personnel responsible for them, adequately protected Plaintiff's and the other Class members' PII.

91.     AMCA's duty of care to use adequate security measures arose as a result of the special relationship that existed between Quest and AMCA on one hand, and Plaintiff and the other Class members on the other, which is recognized by laws and regulations, including, but not limited to, HIPAA and common law. AMCA was in a position to ensure that its systems were sufficient to protect against the foreseeable risk of harm to Plaintiff and the other Class members that arose from the Data Breach.

92.     AMCA, as Quest's business associate, breached its duties by failing to implement adequate safeguards to protect Plaintiff's and the other Class members' PII. AMCA's specific negligent acts and omissions include, but are not limited to, the following:

> a.     Failing to adopt, implement, and maintain adequate safeguards to protect Plaintiff's and the other Class members' PII;
>
> b.     Failing to adequately monitor its security measures;
>
> c.     Allowing unauthorized access to Plaintiff's and other Class members' PII; and
>
> d.     Failing to timely detect the Data Breach.

93.     It was foreseeable that AMCA's negligent acts and omissions as Quest's business associate would result in the Data Breach and injury to Plaintiff and the other Class members and that they would be victims of AMCA's inadequate security measures and security monitoring procedures. AMCA knew or should have known of the inherent risks in collecting and storing PII, the critical importance of providing adequate safeguards to protect PII, the appealing nature of the healthcare industry to hackers, and its inadequate security monitoring protocols in place to protect the PII of Plaintiff and the other Class members.

94.     Plaintiff and the other Class members had no ability to protect their PII that was entrusted to AMCA by Quest.

95.     AMCA, as Quest's business associate, was in a position to protect against the harm suffered by Plaintiff and the other Class members as a result of the Data Breach.

96.     AMCA, as Quest's business associate, had a duty to maintain adequate safeguards to protect Plaintiff's and the other Class members' PII from unauthorized access and use.

97.     AMCA admitted that Plaintiff's and the other Class members' PII was accessed without authorization by third-parties as a result of the Data Breach.

98.     AMCA, as Quest's business associate, breached its duty to Plaintiff and the other Class members by failing to exercise reasonable care in protecting and safeguarding their PII while it was in AMCA's control or possession.

99.     AMCA, as Quest's business associate, improperly and inadequately safeguarded the PII of Plaintiff and the other Class members in derogation of industry standard rules, regulations, and practices at the time of the Data Breach.

100.    AMCA, as Quest's business associate, unlawfully breached its duty to Plaintiff and the other Class members by failing to have appropriate procedures in place to detect and prevent unauthorized access of their PII.

101.    But for AMCA's breaches of its duties to Plaintiff and the other Class members, Plaintiff's and the other Class members' PII would not have been compromised and they would not have been damaged.

102.    Because of their agency relationship, Quest is liable for any and all of AMCA's negligent acts and omissions pursuant to 45 C.F.R. § 160.402(c)(1).

103.    As a result of AMCA's negligence as Quest's business associate, Plaintiff and the other Class members have suffered damages in an amount to be proven at trial.

### Third Claim for Relief
### Violation of New Jersey's Consumer Fraud Act ("CFA")
### (N.J. Stat. Ann. § 56:8-1, *et seq*.)

104.    Plaintiff hereby repeats, realleges, and incorporates by reference each and every allegation contained in Paragraphs 1 through 103 as though the same were fully set forth herein.

105.    By reason of the conduct alleged herein, Defendant engaged in unfair and unlawful practices within the meaning of the CFA. The conduct alleged herein is an "unlawful practice" within the meaning of the CFA. The services provided by Quest and AMCA as Quest's business associate, as alleged herein, constitute "merchandise" within the meaning of the CFA.

106.    Quest represented that it would not disclose its patients' PII – including that of Plaintiff and the other Class members – without consent and/or notice, that it would utilize sufficient data security protocols and mechanisms to protect their PII, and that it would comply with relevant industry data security standards and state and federal law regarding protection of their PII.

107.    Quest failed to abide by these representations as it did not prevent the unauthorized disclosure of Plaintiff's and the other Class members' PII and did not comply with industry data security standards, state law, and federal law with regard to protecting their PII.

108.    Quest and AMCA, as Quest's business associate, stored the PII of Plaintiff and the other Class members in their electronic and consumer information databases. Quest falsely represented to Plaintiff and the other Class members that the PII databases were secure and that their PII would remain private. Quest knew or should have known it and AMCA did not employ reasonable, industry standard, and appropriate security measures that complied with state and federal law and that would have kept Plaintiff's and the other Class members' PII secure and prevented the loss or misuse of their PII.

109.    Even without these misrepresentations, Plaintiff and the other Class members were entitled to assume, and did assume, that Quest would take appropriate measures to keep their PII safe. Quest did not disclose at any time that Plaintiff's and the other Class members' PII was accessible to third-parties because its and AMCA's data security measures and security monitoring procedures were inadequate, even though Quest was the only one in possession of that material information, which it had a duty to disclose. Quest violated the CFA by misrepresenting, both by affirmative conduct and by omission, the strength of the security of its and AMCA's many systems

24

and services, and its ability to honor the disclosure authorizations established by Plaintiff and the other Class members for their PII.

110.    Defendant's acts, omissions, and misrepresentations, as alleged herein, were unlawful and in violation of, *inter alia*, Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and HIPAA.

111.    Plaintiff and the other Class members suffered injury in fact and lost money or property as the result of Quest and AMCA's unlawful acts and practices. In particular, Plaintiff's and the other Class members' PII was taken and is in the hands of those who will use it for their own advantage, or is being sold for value, making it clear that such information is of tangible value.

112.    As a result of Quest's unlawful acts and practices, which are violations of the CFA, Plaintiff and the other Class members are entitled to restitution, disgorgement of wrongfully obtained profits, and injunctive relief.

### Fourth Claim for Relief
### Invasion of Privacy

113.    Plaintiff hereby repeats, realleges, and incorporates by reference each and every allegation contained in Paragraphs 1 through 112 as though the same were fully set forth herein.

114.    Quest's privacy policies for all times relevant to this matter provided that patients' PII would not be released to third-parties without express consent.

115.    As relevant here, Quest's Notice of Privacy Practices states that "[w]e need your written authorization to use or disclose your health information for any purpose not covered by one of the categories below."

116.    As relevant here, one such category is "Business Associates." In that category, Quest states that "[w]e may provide your [protected health information] to other companies or individuals that need the information to provide services to us. These other entities, known as "business associates," are required to maintain the privacy and security of [protected health information]. For example, we may provide information to companies that assist us with billing of

our services. ***We may also use an outside collection agency to obtain payment when necessary***." (emphasis added).

117.    Based on Quest's representations in its privacy policies, Plaintiff and the other Class members used Quest's services under the impression that their PII was safeguarded and would not be provided to, or stolen by, third-parties.

118.    Plaintiff and the other Class members had a reasonable expectation of privacy in the PII they entrusted to Defendant.

119.    Plaintiff and the other Class members had an interest in the protection and non-dissemination of their PII that Defendant electronically stored and transmitted to business associates like AMCA, including the right not to have that PII stolen and used for profit.

120.    When Quest transmitted Plaintiff's and the other Class members' PII to AMCA, it provided information beyond that which was needed for AMCA to provide services to Quest.

121.    As a result, Quest was required to obtain express written authorization from Plaintiff and the other Class members to transmit their PII to AMCA.

122.    Absent the express written consent of Plaintiff and the other Class members, Defendant intentionally intruded on their private life, seclusion, and solitude, which is protected under the common law, when it transmitted their PII to AMCA.

123.    Defendant's wrongful conduct constitutes breach of the social norms underpinning the right to privacy.

124.    Defendant's wrongful conduct harmed Plaintiff and the other Class members.

125.    As a direct and proximate result of Defendant's wrongful conduct, Plaintiff and the other Class members have suffered injury and are entitled to appropriate relief, including injunctive relief and damages.

### Sixth Claim for Relief
### Breach of Confidence

126.    Plaintiff hereby repeats, realleges, and incorporates by reference each and every allegation contained in Paragraphs 1 through 125 as though the same were fully set forth herein.

127.    This claim is asserted against Defendant for breach of confidence concerning the PII that Plaintiff and the other Class members provided to Defendant in confidence.

128.    At all times during Plaintiff's and the other Class members' interactions with Defendant, Defendant was fully aware of the confidential nature of the PII that they shared with Defendant.

129.    As alleged herein and above, Defendant's relationship with Plaintiff and the other Class members was governed by contracts to which they were privy, by Quest's privacy policies, and by the expectation that their PII would be collected, stored, and protected in confidence by Defendant, and not disclosed to unauthorized third-parties.

130.    Plaintiff and the other Class members provided their PII to Defendant with the explicit and implicit understanding that Defendant would protect and not permit that PII to be disseminated to any unauthorized third-parties.

131.    Defendant voluntarily received in confidence Plaintiff's and the other Class members' PII with the understanding that their PII would not be disclosed or disseminated to the public or any unauthorized third-parties.

132.    Due to Defendant's failure to prevent, detect, and stop the Data Breach from occurring, Plaintiff's and the other Class members' PII was disclosed and misappropriated to unauthorized third-parties beyond their confidence and without their express permission.

133.    As a direct and proximate cause of Defendant's actions and inactions, Plaintiff and the other Class members have suffered damages.

134.    But for Defendant's disclosure of their PII in violation of the parties' understanding that it would be held in confidence, Plaintiff's and the other Class members' PII would not have been compromised, stolen, and viewed by unauthorized persons. Defendant's disclosure was a direct and legal cause of the theft of Plaintiff's and the other Class members' PII, as well as the resulting damages.

135.    The injury and harm Plaintiff and the other Class members suffered was the reasonably foreseeable result of Defendant's unauthorized disclosure of their PII. Defendant knew

its computer systems and technologies for accepting and securing Plaintiff's and the other Class members' PII had numerous security vulnerabilities, but Defendant continued to collect, store, and maintain their PII without fixing the vulnerabilities.

136.    As a result of Defendant's misconduct, Plaintiff's and the other Class members' PII was compromised – placing them at a greater risk of identity theft and subjecting them to identity theft and fraud – and disclosed to unauthorized third-parties without their consent. Plaintiff and the other Class members also suffered diminution in value of their PII in that it became easily available to hackers on the dark web. Plaintiff and the other Class members have also suffered consequential out-of-pocket losses for procuring credit freezes or protection services, identity theft monitoring, and other expenses relating to identity theft losses or protective measures.

**Seventh Claim for Relief**
**Breach of Contract**

137.    Plaintiff hereby repeats, realleges, and incorporates by reference each and every allegation contained in Paragraphs 1 through 136 as though the same were fully set forth herein.

138.    At all relevant times, Quest and Plaintiff and the other Class members mutually assented to, and therefore were bound by the version of Quest's privacy policies (collectively, the "Contracts") that were operative at the time they each utilized Quest's services.

139.    Throughout the Class Period, Quest affirmatively stated in the Contracts that it would not disclose its patients' PII without consent and/or notice and that it would utilize sufficient data security protocols and mechanisms to protect its patients' PII.

140.    None of the Contracts informed patients and obtained their meaningful and lawfully-obtained consent to share their content and PII with third-parties without their consent, or disclosed that such information would be shared if Quest entered into an agreement which permitted third-parties to collect that information.

141.    Thus, per the provision above, the Contracts did not authorize Quest to share Plaintiff's and the other Class members' PII with third-parties without their consent.

142.    Plaintiff and the other Class members fully performed their obligations under the Contracts.

143.    Quest breached the Contracts it entered into with Plaintiff and the other Class members by failing to safeguard and protect their PII, failing to adequately monitor the adequacy of the security measures of its agent and business associate, AMCA, and improperly allowing third-parties to access their PII without their consent.

144.    Quest had additional contracts with Plaintiff and the other Class members, where they received medical services from Quest.

145.    In receiving those medical services from Quest, Plaintiff and the other Class members entrusted Quest with their PII.

146.    The contracts for medical services between Plaintiff and the other Class members on one hand, and Quest on the other, was supported by consideration in many forms, including, *inter alia*, payment of monies for medical services.

147.    Plaintiff and the other Class members performed pursuant to these Contracts and satisfied all obligations thereunder.

148.    Under these Contracts, Quest was obligated to maintain the confidentiality of Plaintiff's and the other Class members' PII.

149.    Quest's failure to maintain the confidentiality of Plaintiff's and the other Class members' PII and its allowance of that PII to be disclosed without authorization was a breach of its contractual obligations under its agreements with them.

150.    As a result of Quest's breach of its Contracts, Plaintiff and the other Class members did not receive the full benefit of their bargain, and instead received services that were less valuable than described in the Contracts and as paid for by Plaintiff and the other Class members. Plaintiff and the other Class members were thus damaged in an amount at least equal to the difference in value between the promised services and what Quest actually provided.

151.    As a direct and proximate result of Quest's breaches of the Contracts between it and Plaintiff and the other Class members, Plaintiff and the other Class members sustained actual

losses and damages, as described in detail *supra*. Plaintiff and the other Class members suffered injury-in-fact and lost money or property. In addition, Plaintiff and the other Class members' PII was taken and is in the hands of those who will use it for their own advantage, or is being sold for value, making it clear that the hacked information is of tangible value.

### Eighth Claim for Relief
### Breach of Implied Contract

152.    Plaintiff hereby repeats, realleges, and incorporates by reference each and every allegation contained in Paragraphs 1 through 151 as though the same were fully set forth herein.

153.    Plaintiff brings this claim on behalf of herself and the Class in the alternative to her breach of contract claim.

154.    Plaintiff and the other Class members were required to provide their PII, including names, addresses, dates of birth, Social Security numbers, credit card information, bank account information, and protected health information to Quest as a condition of their use and/or as a result of using and paying for its services.

155.    Plaintiff and the other Class members paid money to Quest in exchange for services, implicit in which was Quest's promise to protect their PII from unauthorized disclosure.

156.    In its privacy policies, Quest promised Plaintiff and the other Class members that it would only disclose protected health information and other PII under certain circumstances and would otherwise comply with applicable state and federal law.

157.    Quest promised and was otherwise obligated to comply with HIPAA standards and to make sure that Plaintiff's and the other Class members' protected health information and other PII would remain protected from unauthorized disclosure.

158.    Implicit in the agreement between Quest and Plaintiff and the other Class members whereby they provided protected health information and other PII to Quest and Quest accepted such protected health information and other PII, was Quest's obligation to use that PII for business purposes only, take reasonable steps to secure and safeguard that protected health information and other PII, and not allow that information to be disclosed without authorization.

159.    Without such an implied contract, Plaintiff and the other Class members would not have provided their protected health information and other PII to Quest.

160.    Plaintiff and the other Class members fully performed their obligations under the implied contract with Quest.

161.    Quest did not fully perform its obligations under the implied contract with Plaintiff and the other Class members.

162.    Quest breached the implied contract with Plaintiff and the other Class members when it:

      a.    failed to reasonably safeguard and protect Plaintiff's and the other Class members' PII, which was compromised as a result of the Data Breach;

      b.    failed to comply with its obligations to abide by HIPAA;

      c.    failed to ensure the confidentiality and integrity of the electronic protected health information Quest received, maintained, created, and transmitted in violation of 45 C.F.R. § 164.306(a)(1);

      d.    failed to implement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1);

      e.    failed to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. § 164.308(a)(1);

      f.    failed to identify and respond to suspected or known security incidents; mitigate, to the extent practicable, harmful effects of security incidents that are known to Quest in violation of 45 C.F.R. § 164.308(a)(6)(ii); and

      g.    failed to protect against any reasonably anticipated threats or hazards to the security or integrity of electronic protected health information in violation of 45 C.F.R. § 164.306(a)(2).

163.    As a result of Quest's breaches of its implied contracts with Plaintiff and the other Class members, they were damaged in an amount to be determined at trial.

**Ninth Claim for Relief**
**Breach of Implied Covenant of Good Faith and Fair Dealing**

164.    Plaintiff hereby repeats, realleges, and incorporates by reference each and every allegation contained in Paragraphs 1 through 163 as though the same were fully set forth herein.

165.    Plaintiff brings this claim on behalf of herself and the Class in the alternative to her breach of contract claim and breach of implied contract claim.

166.    Under New Jersey law, there is in every contract or agreement an implied promise of good faith and fair dealing. Such a duty is read into contracts and functions as a supplement to the express contractual covenants, in order to prevent a transgressing party from engaging in conduct which (while not technically transgressing the express covenants) frustrates the other party's rights to the benefit of the contract. Thus, any claim on the part of Defendant that it was technically permitted to allow the collection and transmittal of Plaintiff's and the other Class members' PII must be read in the context of, and give way to, their rights to the benefit of the contract, including the terms strictly delimiting such activity.

167.    Defendant made specific representations to Plaintiff and the other Class members regarding its protection of patients' PII in its privacy policies that was operative at the time Plaintiff and the other Class members engaged Quest for its services.

168.    A covenant of good faith and fair dealing attaches to Defendant's privacy policies.

169.    Throughout the Class Period, Defendant affirmatively stated in its privacy policies that it would not disclose patients' PII without their consent and/or notice. Defendant further represented in its privacy policies that it would abide by industry standard techniques and state and federal law relating to the safeguarding of patients' PII.

170.    Plaintiff and the other Class members fully performed their obligations under the contracts they entered into with Quest, including its applicable privacy policies.

171.    Under the terms of Quest's privacy policies, Plaintiff and the other Class members were entitled to receive the benefits promised to them by Defendant, including that it would protect their PII, not disclose their PII to third-parties without their consent, and keep their PII secure.

172.     Defendant was uniquely able to control the rights of its patients – including Plaintiff and the other Class members – concerning their privacy, ownership, and control of their content and PII, and whether that content and PII would be provided to third-parties without their consent.

173.     Defendant surreptitiously took measures to frustrate and undercut Plaintiff's and the other Class members' contractual rights concerning their privacy, ownership, and control over their PII, and whether their content and PII would be provided to third-parties without their consent. By doing so, Defendant deprived Plaintiff and the other Class members of the benefits under their contracts with Defendant, including the privacy policies.

174.     As a direct and proximate result of Defendant's breaches of its duty of good faith and fair dealing, Plaintiff and the other Class members sustained actual losses and damages, as described in detail *supra*. Plaintiff and the other Class members suffered injury-in-fact and lost money or property. In addition, their PII was taken and is in the hands of those who will use it for their own advantage, or is being sold for value, making it clear that the hacked information is of tangible value.

### Tenth Claim for Relief
### Unjust Enrichment

175.     Plaintiff hereby repeats, realleges, and incorporates by reference each and every allegation contained in Paragraphs 1 through 174 as though the same were fully set forth herein.

176.     Plaintiff and the other Class members conferred a monetary benefit on Quest when they purchased Quest's medical services, and, in so doing, provided Quest with their PII. In exchange, Plaintiff and the other Class members should have received from Quest the services that were the subject of the transaction, including having their PII protected with adequate safeguards.

177.     Quest knew that Plaintiff and the other Class members conferred a benefit on it and it accepted or retained that benefit. Quest profited from these transactions and the use of Plaintiff's and the other Class members' PII.

178.     The amounts Plaintiff and the other Class members paid Quest were used, in part, to pay for use of Quest's network and the administrative costs of data management and security.

179.    Under the principles of equity and good conscience, Quest should not be permitted to retain the money Plaintiff and the other Class members paid it where it failed to implement and maintain appropriate data security safeguards that are mandated by industry standards and state and federal law.

180.    Quest failed to protect Plaintiff's and the other Class members' PII and therefore did not provide full compensation for the benefit they provided to Quest.

181.    Quest acquired Plaintiff's and the other Class members' PII through inequitable means where it failed to disclose the inadequate data security safeguards alleged *supra*.

182.    If Plaintiff and the other Class members had known that Quest would not adequately protect their PII, they would not have engaged in transactions with Quest and paid Quest money.

183.    Plaintiff and the other Class members have no adequate remedy at law.

184.    As a direct and proximate result of Quest's conduct, Plaintiff and the other Class members have suffered and will suffer injury, including, but not limited to: (i) actual identity theft; (ii) the loss of the opportunity as to how their PII is used; (iii) the compromise, publication, and/or theft of their PII; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their PII; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft; (vi) the continued risk to their PII, which remain in Quest's and AMCA's possession and is subject to further unauthorized disclosures so long as Quest and AMCA fail to undertake appropriate and adequate measures to protect their PII which is in the continued possession of Quest and AMCA; (vii) future costs in terms of the time, effort, and money that Plaintiff and the other Class members will be required to expend in order to prevent, detect, contest, and repair the impact of the PII compromised as a result of the Data Breach for the remainder of their lives; and (viii) the diminished value of Quest's services received.

185.     As a direct and proximate result of Defendant's conduct, Plaintiff and the other Class members sustained actual losses and damages, as described in detail *supra*. Plaintiff and the other Class members suffered injury-in-fact and lost money or property. In addition, their PII was taken and is in the hands of those who will use it for their own advantage, or is being sold for value, making it clear that the hacked information is of tangible value.

186.     Quest should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and the other Class members, proceeds that it unjustly received from them. In the alternative, Quest should be compelled to refund the amounts that Plaintiff and the other Class members overpaid for its services.

### Eleventh Claim for Relief
### Breach of Fiduciary Duty

187.     Plaintiff hereby repeats, realleges, and incorporates by reference each and every allegation contained in Paragraphs 1 through 186 as though the same were fully set forth herein.

188.     In light of the special relationship between Quest and their patients, whereby Quest became guardians of Plaintiff's and the other Class members' sensitive, confidential, personal, and financial information, including protected health information and other PII, Quest became a fiduciary by its undertaking and guardianship of such PII, to act primarily for the benefit of their patients, including Plaintiff and the other Class members, for the safeguarding of their PII.

189.     Quest has a fiduciary duty to act for the benefit of Plaintiff and the other Class members upon matters within the scope of their provider-patient relationships, particularly to keep secure its patients' PII.

190.     Quest breached its fiduciary duties to Plaintiff and the other Class members by failing to:

    a.     investigate the Data Breach, timely discover its existence, and prevent the unauthorized access of Plaintiff's and the other Class members' PII from continuing for the length of the Data Breach;

    b.     ensure the confidentiality and integrity of electronic protected health information that Quest received, created, maintained, and transmitted in violation of 45 C.F.R. § 164.306(a)(1);

c.       implement technical policies and procedures for electronic systems that maintain PII to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1);

d.       implement policies and procedures to detect, contain, and correct security violations in violation of 45 C.F.R. § 164.308(a)(1)(i);

e.       implement procedures to review records of information system activity regularly, such as audit logs, access reports, and security incident tracking reports in violation of 45 C.F.R. § 164.308(a)(1)(ii)(D);

f.       protect against reasonably anticipated threats or hazards to the security or integrity of PII in violation of 45 C.F.R. § 164.306(a)(2);

g.       protect against reasonably anticipated uses or disclosures of electronic PII that are not permitted under the privacy rules regarding identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

h.       ensure compliance with HIPAA security standard rules by their workforces in violation of 45 C.F.R. § 164.306(a)(4); and/or

i.       train all members of its workforce effectively on the policies and procedures regarding PII as necessary and appropriate for the members of its workforce to carry out its functions and to maintain security of PII in violation of 45 C.F.R. § 164.530(b).

191.      As a direct and proximate result of Quest's breaches of its fiduciary duties, Plaintiff and the other Class members have suffered and will suffer injury, including, but not limited to: (i) actual identity theft; (ii) the loss of the opportunity as to how their PII is used; (iii) the compromise, publication, and/or theft of their PII; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their PII; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft; (vi) the continued risk to their PII, which remain in Quest's and AMCA's possession and is subject to further unauthorized disclosures so long as Quest and AMCA fail to undertake appropriate and adequate measures to protect the PII of patients which is in their continued possession; (vii) future costs in terms of the time, effort, and money that Plaintiff and the other Class members will be

required to expend in order to prevent, detect, contest, and repair the impact of the PII compromised as a result of the Data Breach for the remainder of their lives; and (viii) the diminished value of Quest's services received.

192.     As a direct and proximate result of Quest's breaches of its fiduciary duties, Plaintiff and the other Class members have suffered and will continue to suffer other forms of injury and/or harm, and other economic and non-economic losses to be proven at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of the other Class members, respectfully requests that this Court enter an Order:

a.     Certifying the Class, appointing Plaintiff as Class Representative, and appointing the law firm of Franklin D. Azar & Associates as Class Counsel;

b.     Finding that Defendant's conduct was negligent, deceptive, unfair, and unlawful as alleged herein;

c.     Enjoining Defendant from engaging in further negligent, deceptive, unfair, and unlawful business practices as alleged herein;

d.     Awarding Plaintiff and the other Class members actual, compensatory, nominal, consequential, treble, and punitive damages;

e.     Awarding Plaintiff and the other Class members statutory damages and penalties, as allowed by law;

f.     Awarding Plaintiff and the other Class members restitution and disgorgement;

g.     Requiring Defendant to provide appropriate credit monitoring services to Plaintiff and the other Class members;

h.     Awarding Plaintiff and the other Class members punitive damages;

i.     Awarding Plaintiff and the other Class members pre-judgment and post-judgment interest;

j.     Awarding Plaintiff and the other Class members reasonable attorneys' fees costs and expenses, and;

k.      Granting such other relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury of all claims in this Class Action Complaint so triable.


Dated: June 28, 2019

*/s/ Alexander F. Beale*

Alexander F. Beale (#52430)
Ivy T. Ngo (admitted)
**Franklin D. Azar & Associates, P.C.**
14426 East Evans Avenue
Aurora, CO 80014
Telephone: (303) 757-3300
Fax: (720) 213-5131
Email: bealea@fdazar.com
Email: ngoi@fdazar.com

*Counsel for Plaintiff Raben and the Proposed Class*